IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
NORTHERN DIVISION

MICHAEL BURRELL,                    *
                                    *
        Plaintiff,                  *        CIVIL ACTION NO. 14-00036-B
                                    *
vs.                                 *
                                    *
CAROLYN W. COLVIN,                  *
Commissioner of Social Security,*
                                    *
        Defendant.                  *

## ORDER

Plaintiff Michael Burrell (hereinafter "Plaintiff") brings this action seeking judicial review of a final decision of the Commissioner of Social Security denying his claim for a period of disability, disability insurance benefits, and supplemental security income under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401, *et seq.*, and 1381, *et seq.* On December 4, 2014, the parties waived oral argument and consented to have the undersigned conduct any and all proceedings in this case. (Docs. 16, 17). Thus, the action was referred to the undersigned to conduct all proceedings and order the entry of judgment in accordance with 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73. Upon careful consideration of the administrative record and the memoranda of the parties, it is hereby **ORDERED** that the decision of the Commissioner be **AFFIRMED.**

# I.   **Procedural History**

Plaintiff filed an application for a period of disability, disability insurance benefits and supplemental security income on July 29, 2011.  (Tr. 111-24).  Plaintiff alleged that he has been disabled since April 17, 2011, due to right knee problems, diabetes, high blood pressure, back pain, sleeping disorder, and vision problems.  (Id. at 30, 168).  Plaintiff's applications were denied, and upon timely request, he was granted an administrative hearing before Administrative Law Judge Carl B. Watson (hereinafter "ALJ") on August 23, 2012.  (Id. at 28). Plaintiff attended the hearing with his counsel and provided testimony related to his claims.  (Id. at 31).  A vocational expert ("VE") also appeared at the hearing and provided testimony.  (Id. at 47).  On October 4, 2012, the ALJ issued an unfavorable decision finding that Plaintiff is not disabled. (Id. at 23).  The Appeals Council denied Plaintiff's request for review on December 12, 2013.  (Id. at 1).  Thus, the ALJ's decision dated October 4, 2012, became the final decision of the Commissioner.

Having exhausted his administrative remedies, Plaintiff timely filed the present civil action.  (Doc. 1).  The parties agree that this case is now ripe for judicial review and is properly before this Court pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

## II.  Issue on Appeal

> Whether the ALJ erred in failing to give controlling weight to the opinions of Plaintiff's treating physician?

## III. Factual Background

Plaintiff was born on February 11, 1980, and was thirty-two years of age at the time of his administrative hearing on August 23, 2012. (Tr. 28, 111). Plaintiff testified that he was first diagnosed with diabetes when he was thirteen years old and that he takes insulin daily.[1] (Id. at 32). In addition, he has problems with high blood pressure.[2] (Id. at 32-33). Plaintiff stated that he was hospitalized for three days in February 2012 and again in June 2012 because of high blood pressure and high blood sugar. (Id. at 32-34). According to Plaintiff, he has problems with numbness and pain in his feet, which he rated as a seven or eight on a ten-point pain scale. (Id. at 34).

---

[1] Plaintiff testified that his blood sugar usually runs between 230 and 240. (Tr. 32). A normal fasting blood glucose target range for an individual without diabetes is 70-100 mg/dL (3.9-5.6 mmol/L). The American Diabetes Association recommends a fasting plasma glucose level of 70-130 mg/dL (3.9-7.2 mmol/L) and after meals less than 180 mg/dL (10 mmol/L). See http://www.mayoclinic.org/diseases-conditions/diabetes/expert-blog/blood-glucose-target-range/bgp-20056575.

[2] Plaintiff testified that he was hospitalized in February 2012 with a blood pressure of 240/118. (Tr. 32-33). A normal blood pressure is below 120/80 mm Hg. See http://www.mayoclinic.org/diseases-conditions/high-blood-pressure/basics/tests-diagnosis/con-20019580.

Plaintiff also has problems with his right knee and had surgery in November 2009 for a torn meniscus. (Id. at 36-37, 211). Plaintiff rated his knee pain as a seven on the pain scale. (Id. at 37). Plaintiff also has low back pain, which he rated as an eight on the pain scale. (Id. at 37-38). Plaintiff testified that he has kidney problems and may need dialysis in the future. (Id. at 38).

Plaintiff testified that he can stand or sit about fifteen to thirty minutes and that he can walk the length of a football field. (Id. at 34-35). Plaintiff also testified that he has to nap for approximately four hours during the day because his medications make him drowsy.[3] (Id. at 35).

At the hearing and in his Disability Report, Plaintiff stated that he completed two years of college and worked as a correctional officer for eight years from 2003 to 2011. (Id. at 39-41, 169). According to Plaintiff, he can no longer perform the correctional officer job because he cannot stand or walk well, nor can he climb into the tower or ride in a truck because of his back.[4] (Id. at 39-41). Prior to his job as a

_____

[3] Plaintiff testified that he is taking Lasix and Clonidine. (Tr. 35, 38). In addition, he reported to the Agency that he is taking Carvedilol (for blood pressure and heart), Amlodipine (for blood pressure), and Lisinopril (for blood pressure). (Id. at 203).

[4] Plaintiff stated in his Disability Report that he quit working because of his medical conditions and for "other reasons," which

correctional officer, Plaintiff worked on an assembly line putting together dashboards for Mercedes Benz. He also has prior work as a cook in a pizza restaurant, a stocker in a grocery store, a machine operator/warehouse worker in a plastic container business, and as a member of a clean up crew in a fish factory. (Id. at 42, 45-46).

Plaintiff testified that he is a single father of two children, a seven-year-old son and a twelve-year-old daughter, and that his daughter lives with him. (Id. at 42-44). Plaintiff further testified that he drives and does laundry. (Id. at 38, 43, 160-63). In addition, in his Function Report, Plaintiff stated that he takes care of his children, including helping with school work; he performs household chores, including laundry, ironing, and some cooking; he cares for his personal needs; he drives and shops weekly; he handles his own financial affairs, including paying his bills and maintaining his bank accounts; and he fishes, attends football games, and spends time with others. (Id. at 160-63). Plaintiff stated that he has no problem paying attention, following instructions, or getting along with authority figures. (Id. at 164-65).

## IV. **Analysis**

### A.    **Standard of Review**

---

included that he "was let go for something [he] did not do and due to many write ups." (Tr. 169).

In reviewing claims brought under the Act, this Court's role is a limited one. The Court's review is limited to determining 1) whether the decision of the Secretary is supported by substantial evidence and 2) whether the correct legal standards were applied.[5] _Martin v. Sullivan_, 894 F.2d 1520, 1529 (11th Cir. 1990). A court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner. _Sewell v. Bowen_, 792 F.2d 1065, 1067 (11th Cir. 1986). The Commissioner's findings of fact must be affirmed if they are based upon substantial evidence. _Brown v. Sullivan_, 921 F.2d 1233, 1235 (11th Cir. 1991); _Bloodsworth v. Heckler_, 703 F.2d 1233, 1239 (11th Cir. 1983) (holding substantial evidence is defined as "more than a scintilla, but less than a preponderance" and consists of "such relevant evidence as a reasonable person would accept as adequate to support a conclusion."). In determining whether substantial evidence exists, a court must view the record as a whole, taking into account evidence favorable, as well as unfavorable, to the Commissioner's decision. _Chester v. Bowen_, 792 F. 2d 129, 131 (11th Cir. 1986); _Short v. Apfel_, 1999 U.S. Dist. LEXIS 10163, *4 (S.D. Ala. June 14, 1999).

**B.  Discussion**

---

[5] This Court's review of the Commissioner's application of legal principles is plenary. _Walker v. Bowen_, 826 F.2d 996, 999 (11th Cir. 1987).

An individual who applies for Social Security disability benefits must prove his or her disability. 20 C.F.R. §§ 404.1512, 416.912. Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A); see also 20 C.F.R. §§ 404.1505(a), 416.905(a). The Social Security regulations provide a five-step sequential evaluation process for determining if a claimant has proven his disability.[6] 20 C.F.R.

---

[6] The claimant must first prove that he or she has not engaged in substantial gainful activity. The second step requires the claimant to prove that he or she has a severe impairment or combination of impairments. If, at the third step, the claimant proves that the impairment or combination of impairments meets or equals a listed impairment, then the claimant is automatically found disabled regardless of age, education, or work experience. If the claimant cannot prevail at the third step, he or she must proceed to the fourth step where the claimant must prove an inability to perform their past relevant work. Jones v. Bowen, 810 F.2d 1001, 1005 (11th Cir. 1986). In evaluating whether the claimant has met this burden, the examiner must consider the following four factors: (1) objective medical facts and clinical findings; (2) diagnoses of examining physicians; (3) evidence of pain; and (4) the claimant's age, education and work history. Id. Once a claimant meets this burden, it becomes the Commissioner's burden to prove at the fifth step that the claimant is capable of engaging in another kind of substantial gainful employment which exists in significant numbers in the national economy, given the claimant's residual functional capacity, age, education, and work history. Sryock v. Heckler, 764 F.2d 834, 836 (11th Cir. 1985). If the Commissioner can demonstrate that there are such jobs the claimant can perform, the claimant must prove inability

§§ 404.1520, 416.920.

In the case *sub judice*, the ALJ determined that Plaintiff has not engaged in substantial gainful activity since April 17, 2011, the alleged onset date, and that he has the severe impairments of diabetes, hypertension, right knee chondromalacia,[7] and obesity. (Tr. 16). The ALJ further found that Plaintiff does not have an impairment or combination of impairments that meets or medically equals any of the listed impairments contained in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Id. at 18).

The ALJ concluded that Plaintiff retains the residual functional capacity (hereinafter "RFC") to perform light work, except that he cannot climb ladders, ropes or scaffolds; he can occasionally kneel, crouch and crawl; and he must avoid unprotected heights. (Id. at 19). The ALJ also determined that while Plaintiff's medically determinable impairments could reasonably be expected to produce the alleged symptoms, his statements concerning the intensity, persistence and limiting

_____

to perform those jobs in order to be found disabled. Jones v. Apfel, 190 F.3d 1224, 1228 (11th Cir. 1999). See also Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987) (citing Francis v. Heckler, 749 F.2d 1562, 1564 (11th Cir. 1985)).

[7] Chondromalacia patella is a general term indicating damage to the cartilage under the kneecap, caused by overuse, injury, or other factors. See http://www.mayoclinic.org/diseases-conditions /chondromalacia-patella/basics/definition/con-20025960.

effects of the alleged symptoms were not credible to the extent that they were inconsistent with the RFC. (Id. at 20).

Given Plaintiff's RFC, the ALJ found that Plaintiff is capable of performing his past work as an assembler (which is light and unskilled) and as a cook (which is light and semi-skilled). (Id. at 22). Thus, the ALJ concluded that Plaintiff is not disabled. (Id.).

Also pertinent to this appeal are the findings made by the ALJ in reaching his decision that Plaintiff is not disabled. Id.). In determining that Plaintiff did not meet any Listing, the ALJ made the following relevant findings:

> With diabetes mellitus . . . we evaluate cardiac arrhythmias, coronary artery disease and peripheral vascular disease under 4.00 and intestinal necrosis under 5.00 [as well as] cerebral edema and complications of severe hypoglycemia . . . under 11.00[;] [r]ecurrent episodes of diabetic ketoacidosis . . . under 12.00[;] diabetic peripheral neurovascular disease . . . under 1.00[;] diabetic retinopathy under 2.00[;] diabetic gastroparesis . . . under 5.00[;] diabetic nephropathy under 6.00[;] poorly healing bacterial and fungal skin infections under 8.00[;] diabetic peripheral and sensory neuropathies under 11.00 and altered mental status . . . under 12.00. There is no evidence of record to suggest that the claimant meets or equals any of these listings.
>
> As for the claimant's hypertension, the undersigned has considered this condition through its effects on other body systems such as the heart, brain, kidneys and eyes. In August 2012, the claimant's renal

function was stable. (Exhibit 17F).
Additionally, his vision is 20/40 in both
eyes without glasses. (Exhibit 9F). He has
been assessed with hypertension but recent
treatment notes from 2012 document that this
condition is reasonably well controlled.
(Exhibit 17F).

The claimant's right knee chondromalacia has
been considered under Listings 1.02 and
1.03. . . . At a consultative examination in
October 2011, the claimant had normal
unaided gait. (Exhibit 9F). He has not
received any orthopedic treatment for a knee
problem since the alleged onset date. As
such, his history of right knee
chondromalacia does not meet or equal the
requirements of Listings 1.02 or 1.03.

Regarding the claimant's obesity, . . . he
weighs 324 pounds and is 6 feet 4 inches
tall. This equates to a body mass index of
39.4. Despite his obesity, the claimant has
been able to move about generally well and
sustain consistent function. At a
consultative examination in October 2011,
the claimant had a normal, unaided gait.
(Exhibit 9F). There has been no showing
that the claimant suffers from significant
sleep apnea and although he has
hypertension, treatment notes from 2012
document that this condition is reasonably
well-controlled with medication. (Exhibit
17F). Furthermore, there is no showing that
the claimant's ability to manipulate has
been negatively impacted by the presence of
adipose tissue. After a thorough review of
the evidence of record, the undersigned
finds that the claimant's obesity has not
had an effect above the residual functional
capacity set forth below.

(Tr. at 18-19).

Further, in assessing Plaintiff's RFC, the ALJ made the

following relevant findings:

After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except that he cannot climb ladders, ropes or scaffolds; he can occasionally kneel, crouch and crawl; and he must avoid unprotected heights.

. . .

The evidence of record documents that the claimant was diagnosed with diabetes when he was 13-years old. He takes insulin but has not been to an endocrinologist. The claimant has reported that he is on an 1800 calorie diet and checks his blood sugar levels two times per day. In October 2011, the claimant stated that his last hospitalization for a blood sugar level problem had not been since 2009. (Exhibits 7F and 9F). At his hospitalization in February 2012 for elevated blood pressure levels, the claimant reported that his diabetes was normally well-controlled but his sugars had recently risen to over 500. He was diagnosed with hyperglycemia. (Exhibit 14F). The claimant has not had any further hospitalizations for hyperglycemic or hypoglycemic events since this time. The longitudinal evidence of record documents that the claimant's diabetes is adequately controlled with medication, with the exception of one hyperglycemic event in February 2012. The limitation to light work with the above-noted postural restrictions adequately accommodates any symptoms he may experience from diabetes.

As for his hypertension, treatment notes document that this condition is adequately controlled with medication. In March 2012, the claimant's blood pressure was elevated with a reading of 166/89. He had recently been hospitalized for poorly controlled

hypertension. (Exhibit 17F). Hospital treatment notes from February 2012 confirm a hospitalization for a blood pressure reading of 220/140. (Exhibit 14F). Dr. Gurich increased the claimant's prescription for Lisinopril to 40 mg twice daily and increased his Norvasc to twice daily. At a follow-up appointment in April 2012, the claimant's blood pressure log revealed that his pressure was under excellent control. His reading upon examination was 130/60. Likewise, in August 2012, the claimant's blood pressure was for the most part well-controlled. The claimant endorsed some medication side effects such as drowsiness and lower extremity edema. (Exhibit 17F). The evidence of record from 2011 also demonstrates that the claimant was non-compliant with his blood pressure medication, likely accounting for his elevated pressure levels. By way of example, in September 2011, the claimant's blood pressure at his consultative examination was 250/140 and Dr. Robidoux informed him that he needed to go to the emergency room immediately. The dates on his medication bottles demonstrated that he did not take his blood pressure medication as directed and he was diagnosed with poor medical compliance. (Exhibit 7F). Overall, the evidence of record relating to the claimant's hypertension demonstrates that this condition is reasonably well controlled with minimal side effects that are accounted for in the above residual functional capacity.

Treatment notes also confirm that the claimant underwent arthroscopic surgery on his right knee in 2009. (Exhibit 9F). At a consultative examination in October 2011, the claimant had normal range of motion of the bilateral knees. He exhibited a normal, unaided gait and was able to squat and rise. (Exhibit 9F). Since the alleged onset date, the claimant has not had any orthopedic treatment for a knee problem. There is no

indication that he has trouble ambulating or requires the use of an assistive device. As such, the undersigned finds that he is capable of performing light work with the above-noted postural restrictions.

At the hearing, the claimant testified that he was 324 pounds 6 feet 4 inches tall. This equates to a body mass index of 39.4. Despite his obesity, the claimant has been able to move about generally well and sustain consistent function. At a consultative examination in October 2011, the claimant had a normal, unaided gait. (Exhibit 9F). There has been no showing that the claimant suffers from significant sleep apnea; and although he has hypertension, treatment notes from 2012 document this condition is reasonably well controlled with medication. (Exhibit 17F). Furthermore, there is no showing that the claimant's ability to manipulate has been negatively impacted by the presence of adipose tissue. After a thorough review the evidence of record, the undersigned finds that the claimant's obesity has not had an effect above the residual functional capacity set forth below.

(Tr. 19-21)

In discussing the medical opinions contained in the record, the ALJ made the following relevant findings:

Pursuant to 20 CFR §404.1527, §416.927, and Social Security Rulings 96-6p and 96-2p, the undersigned has considered the medical opinions of the claimant's treating physicians, evaluating physicians, and the state agency medical consultants. Specifically, the undersigned has considered Dr. Robidoux's opinion. Dr. Robidoux concluded in October 2011 that the claimant had no limitations in sitting, standing, walking, lifting, carrying, climbing,

crawling, handling objects, using hand and foot controls, talking, listening and traveling. (Exhibit 9F). This opinion has been accorded some weight although the undersigned finds that the claimant's combination of impairments would limit him to light work with the above-noted postural restrictions. However, the undersigned has considered Dr. Robidoux's findings, particularly the claimant's normal range of motion of the knees and ability to walk with a normal gait and accord these findings significant weight.

Additionally, the undersigned has considered the opinions provided by Dr. Judy Travis. Dr. Travis concluded that the claimant could only work 4 hours per day, stand 15 minutes at one time, sit 4 hours at one time, lift 20 pounds occasionally and 5 pounds frequently. (Exhibit 13F). Additionally, Dr. Travis concluded in January 2012 that the claimant could sit 4 hours total during an 8-hour day, and stand/walk less than one. She noted that the claimant could occasionally lift up to 25 pounds and occasionally carry up to 20 pounds. She recommended limitation of postural activities to no more than occasional and stated that the claimant would likely miss more than three days of work per month. Regarding pain, she stated that the claimant's pain was present to such an extent that it was distracting to adequate performance of daily activities with significant side effects rendering him unable to work. (Exhibit 11F). These opinions have all been accorded little weight. As set forth above, the claimant's diabetes has been adequately controlled with medication for a large portion of the alleged period of disability, with the exception of one hyperglycemic event in February 2012. The claimant is not receiving treatment from an endocrinologist. Additionally, his gait, station and knee range of motion are within normal limits and

his hypertension has recently been adequately controlled with increases in prescription medication. As such, Dr. Travis's opinions are not consistent with the substantial medical evidence of record.

Lastly, the undersigned has considered the opinions of the State Agency medical consultants who provided medical evaluations. In November 2011, Dr. Harper concluded that the claimant had no severe impairments. (Exhibit 10F). This opinion has been accorded little weight as the undersigned finds the claimant's diabetes, hypertension, history of right knee chondromalacia and obesity cause more than minimal functional limitations. The undersigned has limited the claimant to light work with no climbing ladders/ropes/ scaffolds and only occasional kneeling, crouching and crawling. Additionally, the undersigned has limited the claimant to no exposure to unprotected heights.

(Tr. at 21-22). The Court now considers the foregoing in light of the record in this case and the issue on appeal.

1. **Issue**

> **Whether the ALJ erred in failing to give controlling weight to the opinions of Plaintiff's treating physician?**

Plaintiff argues that the ALJ erred in not giving controlling weight to the opinions of his treating physician, Dr. Judy Travis, that he could work for only four hours a day.[8]

---

[8] As discussed herein, the record shows that the ALJ gave "little weight" to the opinions of Dr. Travis set forth in the January 25, 2012 and May 30, 2012 Medical Source Statements ("MSS") and the January 25, 2012 Clinical Assessment of Pain ("CAP") form. (Tr. 21, 307, 328).

(Doc. 13 at 4). The Commissioner counters that the ALJ properly discounted Dr. Travis's opinions because they are inconsistent with the record evidence in this case. (Doc. 14 at 6-8). Having carefully reviewed the record, the Court agrees with Defendant that Plaintiff's claim is without merit.

Generally speaking, "[i]f a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight."[9] Roth v. Astrue, 249 Fed. Appx. 167, 168 (11th Cir. 2007) (citing 20 C.F.R. § 404.1527(d)(2)).

"An administrative law judge must accord substantial or considerable weight to the opinion of a claimant's treating physician unless good cause is shown to the contrary." Broughton v. Heckler, 776 F.2d 960, 961 (11th Cir. 1985)(citations and internal quotation marks omitted). "The requisite 'good cause' for discounting a treating physician's opinion may exist where the opinion is not supported by the evidence, or where the evidence supports a contrary finding." Hogan v. Astrue, 2012 U.S. Dist. LEXIS 108512, *8, 2012 WL

---

[9] "Controlling weight" is defined as a medical opinion from a treating source that must be adopted. See SSR 96-2P, 1996 SSR LEXIS 9, *3, 1996 WL 374188, *1 (1996).

3155570, *3 (M.D. Ala. 2012). "Good cause may also exist where a doctor's opinions are merely conclusory, inconsistent with the doctor's medical records, or unsupported by objective medical evidence." Id. "[T]he weight afforded a treating doctor's opinion must be specified along with 'any reason for giving it no weight, and failure to do so is reversible error.'" Williams v. Astrue, 2009 U.S. Dist. LEXIS 12010, *4, 2009 WL 413541, *1 (M.D. Fla. 2009); see also Phillips v. Barnhart, 357 F.3d 1232, 1241 (11th Cir. 2004) ("When electing to disregard the opinion of a treating physician, the ALJ must clearly articulate [his or her] reasons.").

The record in this case shows that Dr. Travis treated Plaintiff from 2007 to 2012 for various ailments including diabetes, hypertension, stomach pain, back pain, sore throat, and medication refills. (Tr. 219-31, 342-43). On January 25, 2012, Dr. Travis completed a Medical Source Statement ("MSS") form in which she opined that Plaintiff could sit for only one hour at a time for a total of four hours in an eight-hour workday, and that Plaintiff could stand/walk for less than one hour a day. (Id. at 307). On that date, Dr. Travis also completed a Clinical Assessment of Pain ("CAP") form in which she stated that Plaintiff's pain is "present to such an extent as to be distracting to adequate performance of daily activities;" that physical activity will increase the pain "to

17

such an extent that bed rest and/or medication [will be] necessary;" and that significant side effects from Plaintiff's medications "may be expected which may limit effectiveness of work duties or performance of everyday tasks." (Id. at 309). On May 30, 2012, Dr. Travis completed a second MSS form in which she opined that Plaintiff could work for only four hours in an eight-hour workday; that he could stand for only fifteen minutes at one time; and that he could sit for four hours at one time. (Id. at 328). Having reviewed the record at length, the Court finds, as the ALJ found, that Dr. Travis' opinions are not supported by the record.

First, as the ALJ articulated, Dr. Travis' opinions are inconsistent with the medical evidence in this case, including her own treatment records. Dr. Travis opined in her January 25, 2012, CAP form, that Plaintiff's disability was the result of "severely labile diabetes[10] with peripheral neuropathy." (Id. at 310). However, Dr. Travis' treatment records show that Plaintiff's diabetes was adequately controlled during the period in question, except during his hospitalization in February 2012.[11] (Id. at 20, 278). Dr. Travis' treatment notes reflect

---

[10] Labile diabetes is another name for brittle or unstable diabetes. See http://rarediseases.info.nih.gov/gard/11900/brittle-diabetes/resources/1.

[11] In fact, on September 28, 2011, Plaintiff told consultative examiner, Dr. Stephen Robidoux, M.D., that he had been on

that when she had Plaintiff admitted to Bryan Whitfield Hospital in February 2012 for high blood pressure, high blood sugar, and complaints of severe headaches, she expressly noted that Plaintiff's diabetes was "normally well controlled." (Id. at 332). As the ALJ noted, none of Plaintiff's treating physicians, including Dr. Travis, ever referred him to an endocrinologist or a specialist of any kind for his diabetes.

In addition, Dr. Travis opined in the January 2012 MSS form that Plaintiff could sit for only one hour at a time. (Id. at 307). Interestingly, four months later in the May 2012 MSS form, she opined that he could sit for four hours at one time. (Id. at 328). In addition, Dr. Travis opined that Plaintiff could stand/walk for only fifteen minutes at one time, for a total of less than one hour in an eight-hour workday; that Plaintiff's pain was present to such an extent as to be distracting to the adequate performance of daily activities; and that physical activity would increase his pain to such an extent that bed rest or medication would be necessary. (Id. at 308-09, 328). Yet, her own treatment notes from Plaintiff's February 2012 hospitalization show that while Plaintiff's blood pressure was elevated and he reported muscle weakness on right side of face, his examination revealed normal cardiovascular function,

---

insulin for diabetes since he was thirteen years old and that he had not been hospitalized for diabetes since 2009. (Tr. 278).

normal respiration, full range of motion of all joints, good muscle mass bilaterally, "[a]ll muscles functioning well," no atrophy, and no swelling.[12] (Id. at 334-35). In addition, while Dr. Travis' treatment records from Plaintiff's subsequent hospitalization in June 2012 for abdominal pain and vomiting reflects a blood pressure of 170/100 and epigastric tenderness, upon examination, Plaintiff had normal chest and heart function, normal lungs, full range of motion of all joints in all extremities, no swelling, good muscle mass bilaterally, no atrophy, and normal neurological function.[13] (Id. at 336, 339, 342). These findings are simply not consistent with the extreme limitations listed by Dr. Travis in the January and May 2012 MSS and CAP forms. (Id. at 307-09, 328).

In addition to being inconsistent with her own treatment records, Dr. Travis' opinions are inconsistent with the findings and opinions of consultative examiner, Dr. Stephen Robidoux, M.D., who examined Plaintiff on September 28, 2011 and October 24, 2011. The record shows that Dr. Robidoux suspended the examination on September 28, 2011 and instructed Plaintiff to go

---

[12] Dr. Travis diagnosed Plaintiff with "malignant hypertension with chest pain," "hyperglycemia with Type 1 insulin dependent diabetes," obesity, and anxiety/stress. (Tr. 332). After five days of medication treatment, she transferred Plaintiff to DCH Hospital for an assessment of his heart. (Id.).

[13] Dr. Travis treated Plaintiff with antibiotics for two days and then discharged him. (Tr. 336, 339).

to the emergency room because Plaintiff's blood pressure was extremely high (250/140). (Id. at 280). Plaintiff returned on October 24, 2011, and advised Dr. Robidoux that he was not hospitalized on September 28, 2011, but was given Clonidine (for high blood pressure). (Id. at 299-300). He also reported that he had not seen any other medical providers in the interim. (Id.). Plaintiff reported that his blood sugar on October 24, 2011, was 145. (Id.).

Dr. Robidoux's examination revealed normal range of motion in all extremities, including knees, ankles, hips, shoulders, elbows, wrists, and fingers, normal arches in his feet, and no atrophy or muscle weakness in his thighs. (Id. at 303). Dr. Robidoux stated: "full range of motion upper and lower with no joint effusions, no redness, no deformities, no cyanoses, no clubbing, no cellulites, no heat, no edema;" "normal fine touch;" "normal proprioception;" "normal vibratory sensation" except in left great toe; normal cold discrimination. (Id.). In addition, Plaintiff had normal range of motion in his back. (Id.). Plaintiff was able to flex toward his toes, with full range of motion and no muscle tenderness. (Id.). His straight leg and bent leg raising was normal. (Id.). Dr. Robidoux noted that Plaintiff was "[a]ble to lay flat back and get straight up on examining table." (Id.). Plaintiff had a "normal unaided gait" and was "able to squat and raise, normal toe walking."

(Id.).  In addition, Dr. Robidoux's examination revealed normal findings related to Plaintiff's lungs, heart, and abdomen, and his neuromuscular examination was completely normal.  (Id. at 304).

Dr. Robidoux assessed Plaintiff with severe hypertension, poor medical compliance, and diabetes.  (Id.).  Dr. Robidoux concluded:

> Mr. Burrell presents with poor compliance to medical care. His blood pressure was very high when he came here on 9/28/11 for a disability evaluation and was sent to the emergency room at Demopolis, Alabama. He still hasn't been back to his family doctor. He was strongly advised to see his family doctor. I find no limitations on his evaluation for age to sitting, standing, walking, lifting, carrying, climbing, crawling, handling objects, using hand and foot controls, talking, listening and travel. He has a drivers license.

(Id. at 304).  As the ALJ found, Dr. Travis' opinions in the January and May 2012 MSS and CAP forms regarding the degree of limitations caused by Plaintiff's hypertension, diabetes, and other medical impairments are inconsistent with this evidence.

In addition to being inconsistent with her own treatment notes and the opinions of consultative examiner Dr. Robidoux, Dr. Travis' opinions are also inconsistent with the treatment records of Plaintiff's other treating physicians.  As the ALJ found, the record shows that after Dr. Travis transferred Plaintiff to DCH Hospital on February 22, 2012, Dr. Inkil

Hwangpo, D.O., examined Plaintiff and diagnosed him with "hypertensive urgency, not malignant hypertension" and "uncontrolled" type 2 diabetes. (Id. at 312-14). Dr. Hwangpo found Plaintiff's cardiovascular functioning to be normal, and his stress test was negative. (Id. at 314). In addition, radiographic imaging showed normal kidneys and bladder with "no evidence of medical renal disease or hydronephrosis." (Id. at 314, 319). Dr. Hwangpo discharged Plaintiff after two days, noting that Plaintiff "did well during hospital stay;" that he was started on multiple blood pressure medications; and that he was to follow up with outpatient nephrology. (Id. at 314). Dr. Hwangpo also noted that Plaintiff's condition on discharge was "improved," and instructed him that he "[m]ay return to usual activity level as tolerated." (Id. at 315).

Likewise, Plaintiff's other attending physicians during his February 2012 hospitalization, Dr. Robert Sheppard, M.D., and Dr. Lawrence Lee, M.D., noted that Plaintiff had "hypertensive urgency" but that he did not have "any evident acute end organ damage." (Id. at 316-17). They also noted that Plaintiff's diabetes was a "chronic problem" but stated that they would continue his home insulin and start him on a statin. (Id.). They found that Plaintiff had normal strength bilaterally in his upper and lower extremities. (Id. at 317).

On March 13, 2012, Plaintiff was referred to Dr. Richard

Gurich, M.D., for hematuria, proteinuria, and hypertension.[14] (Id. at 348). Dr. Gurich's examination revealed normal head, eyes, ears, nose and throat, normal lungs, normal heart, normal abdomen, normal back, normal extremities with no edema, and normal neurological function. (Id.). Dr. Gurich noted that Plaintiff had been referred for chronic kidney disease and poorly controlled hypertension and that Plaintiff's normal blood pressure was 169 over 90, which was too high. (Id.). He increased Plaintiff's medication and instructed him to return in three weeks. (Id.). Plaintiff returned on April 3, 2012, and Dr. Gurich noted that Plaintiff's blood pressure was "under excellent control." (Id. at 347). He further opined that Plaintiff's peripheral edema was being caused by medication, not congestive heart failure. (Id.). He prescribed Lasix and instructed Plaintiff to return in four months to repeat his lab work. (Id.). Plaintiff returned to Dr. Gurich on August 7, 2012, and his examination again revealed a normal heart, normal lungs, normal head, eyes, ears, nose, and throat, a normal abdomen, a normal back, good circulation, and normal neurological function. (Id. at 346). Dr. Gurich diagnosed

---

[14] Hematuria refers to blood in the urine. See http://www.mayoclinic.org/diseases-conditions/blood-in-urine /basics/definition/con-20032338. Proteinuria refers to protein in the urine. See http://www.mayoclinic.org/symptoms/protein-in-urine/basics/definition/sym-20050656.

Plaintiff with chronic kidney disease but found his renal function to be "stable." (Id.). Dr. Gurich further noted that Plaintiff's blood pressure was "for the most part well controlled." (Id.). Dr. Gurich noted that Plaintiff complained of drowsiness from Clonidine and lower extremity edema from Norvase and indicated that he would try a different medication to address the side effects. (Id.). These are the final treatment notes in the record. As the ALJ found, this evidence is likewise inconsistent with the disabling functional limitations set forth by Dr. Travis in the January and May 2012 MSS and CAP forms.

Last, as the ALJ articulated, the record shows that Dr. Travis' opinions are inconsistent with Plaintiff's testimony regarding his activities of daily living. At the hearing, Plaintiff testified that he could walk the length of a football field. (Id. at 34). In addition, he stated that he lives with his twelve-year-old daughter; he drives and shops; he does laundry and ironing; he cooks; he helps with school work; he handles his own personal care; he handles his own bills and finances; he fishes, attends football games, and spends time with others. (Id. at 38, 42-44, 160-63). This evidence regarding Plaintiff's daily activities contrasts greatly with Dr. Travis' opinion that Plaintiff can only stand for fifteen minutes and sit for a total of four hours in an eight-hour work

day.  (Id. at 307, 328).

Based on the foregoing evidence, the Court finds that Dr. Travis' opinions set forth in the January and May 2012 MSS and CAP forms are inconsistent with the record evidence in this case.  Therefore, the ALJ did not err in failing to give controlling weight to those opinions.  The substantial medical evidence in this case supports the ALJ's finding that Plaintiff can perform his past work as an assembler or cook.  Therefore, Plaintiff's claim is without merit.

### V.    Conclusion

For the reasons set forth herein, and upon careful consideration of the administrative record and memoranda of the parties, it is hereby **ORDERED** that the decision of the Commissioner of Social Security denying Plaintiff's claim for a period of disability, disability insurance benefits, and supplemental security income be **AFFIRMED.**

**DONE** this **12th** day of **December, 2014.**

**/s/ SONJA F. BIVINS**
**UNITED STATES MAGISTRATE JUDGE**